May it please the Court, I am Joshua Glellen, appearing on behalf of the Youth Petitioner, Mr. Dupree, the attorney for Jesus Azua. The case presents a pattern of fee-shifting determinations by the administrative tribunals, and particularly the ALJs. In Longshore Act cases, in the wake of this Court's revolutionary, for the Longshore Act practice, decisions in Christensen and Van Skyke, those decisions merely articulated what had been longstanding general federal fee-shifting law under other statutes, but that the Board and the administrative law judges had not been applying under the Longshore Act.  To look to prevailing market rates for legal services in the relevant community, treating longshore practice instead as sui generis and longshore claimants' practitioners as entitled only, essentially, to what they had been awarded before by the longshore tribunal, the administrative tribunals. This is one more skirmish in the war to bring them into compliance with general fee-shifting law. What the ALJ did here in their first two issues are methodological errors, which are completely typical of the ALJ's decisions in the last several years since Christensen and Van Skyke. Can I ask you one question just before you go down that road? Please. As I understand it, we actually are reviewing the BRB's decisions. Right. Which I thought maybe had corrected some of the methodological errors that you were just about to point out in the ALJ's ruling. Does that somehow cure the issue for us? No. They did the first time, as the first time the ALJ had just awarded, I'm wording what I've awarded before to comparable counsel under the Longshore Act. After the Board kicked it back in the wake of Christensen and Van Skyke, the ALJ did what ALJs have been doing since then. Not in every case, but typically, which is discount all the market rate evidence that is submitted on one basis or another in support of the claimed rate. And even though there is no rebuttal evidence that pertains to the relevant community market and prevailing market rates there, simply picking a number from somewhere else. Now, here the number the ALJ ended up with was almost exactly intermediate between what he had originally awarded and what the market rate evidence, the claimed rate, which the market rate evidence. Counsel, I'm not sure I totally understood your answer to Judge Watford's question, which I think was, what is the decision we're reviewing? Is it the August 18, 2011 decision of the BRB? Well, it is the ALJ's decision on remand, which the Board affirmed there. Right, so is it the BRB's final decision in 2011 that we're reviewing? Yes, yes, certainly so. And all the Board did there was to say it was within the ALJ's discretion to come up with the number that he came up with for an hourly rate and to knock 20 percent off of the resulting figure, even after having already eliminated virtually every minute that had been devoted to the only issues on which the claimant did not prevail. Well, I guess I read the BRB's, let's just focus on the hourly rate first. Please. The 20 percent I know is a separate issue. But I guess I read the BRB as saying, look, the only evidence that I guess your client presented. Mr. Dupree, yes. Mr. Dupree presented with respect to the relevant legal market, which is San Diego. Right. And you would assume that the range of rates for at least Mr. Dupree, the rate that the ALJ ended up awarding was within the range. And then the BRB looked through the rest of the evidence and said, yes, we don't see any error there in picking, yes, it's toward the lower end, but it's within the range of rates from the relevant legal community that Mr. Dupree himself had submitted. Well, the problem with that reasoning of the Board is that it is not what the ALJ did. The ALJ came up with that number by looking at the only evidence that NASCA did submit, which was national average figures. That's why I was asking the question I started out with, because I thought we were just reviewing the BRB's decision. Now I understand that question from both you and Judge Graber, yes. Yes, we're reviewing the Board's decision, and the Board's decision is not a supportable reading of what the ALJ did. The figures the ALJ came up with were based on national averages and were not based on anything in the evidence that Mr. Dupree submitted with respect to all three of the coastal California metropolitan regions, including San Diego, which we all agree is the relevant community. Here's one of the issues that at least troubled me with respect to the hourly rate question. The evidence that was submitted by Mr. Dupree appeared to either involve other communities, not San Diego, or other kinds of cases, such as ERISA cases. And in view of that, how relevant is that, and why wasn't the BRB entitled to look to other sources for the rate? Well, now that touches on something going back to whose decision we're reviewing. The Board, unlike the MLRB and lots of other unitary... It's reviewing. Yes. But the question remains that it wasn't like presenting, here are five people in San Diego who've done exactly this kind of case, and this is their rate. If so, I think you'd be in a very much stronger position. Well, but as Christensen and VanSkyke recognizes, that's the evidence that we can never produce because longshore claimants are foreclosed by the statute from contracting for any rate. There are no market rates for longshore work, which is why Christensen and VanSkyke said no. It is necessary to look to market rates in other specialties that have comparable kinds of work. Now, the ERISA disability cases are almost perfectly parallel to what's presented in a longshore case. You're presenting the question whether this condition is... How disabling is it? What's the claimant's residual earning capacity? Is it totally disabling, partially disabling? And, of course, in longshore cases, what you don't typically have in the ERISA cases because they're not dependent on whether the disabling condition is employment-related or not, in longshore, you also have that causation issue. But the basic kind of a proceeding, seeking periodic benefits for a disabling condition, is the same in ERISA conditions, ERISA cases, as in the Longshore Act cases. The ALJ's reference to possible jury trials has no application to any of these Truth in Lending Act cases, fair credit reporting cases, several of those that are fee-shifting statutes and that were most of the district court fee determinations that Mr. Dupree presented from, in effect, the first aspect of your question, Judge Craver, the Southern District of California were San Diego cases. So, yes, that aspect of his awards in similar cases evidence was directly applicable to San Diego. Some of the affidavit evidence showed, and the comparison with the fee awards by the other two coastal California district courts, showed that the rates for all three of those districts are roughly comparable, although San Diego rates, Southern California rates, are slightly lower than Los Angeles and San Francisco rates. But definitely in the same ballpark, and the rate Mr. Dupree was seeking was very moderate by either Los Angeles or San Francisco standards, on which he had the survey evidence, metropolitan area analyses, from the two proprietary fee surveys. But the data inputs for those surveys included mostly big firm partners? So the ALJ seems to have reason. This decision is not perfectly clear. But, no, there is no basis for believing that. And, in fact, if you look at the data reported in those tables. Do we have that before us? Yes, those are in the record. They were part of the evidence Mr. Dupree submitted. It's not in the record excerpts, but it is in the record that the board sent up. I'd be happy to supply the court with copies of those as soon as I get back to the office tomorrow. I'm sure we can get them. Yes, yes. They are in the record that was sent by the board to the court. And I recounted, I think, in the opening brief, that those data showed that the average size of the firms involved was eight attorneys. We're not talking about huge national firms with an 80-lawyer office in San Francisco or San Diego. We're talking about the average overall of everybody surveyed by those. And we don't have every aspect of the underlying data to nail down everything about those data. But we can say there were 80 attorneys in 10 firms or 68 attorneys in 7 firms. That is revealed by the tables that were submitted into evidence. Moreover, facially, it goes to the relevant question of the prevailing market rates in the relevant community, and no rebuttal was submitted. That, I think, is the most critical aspect of that. This court has said again and again that if satisfactory evidence, which it has said includes affidavits of counsel and other attorneys knowledgeable about the local market and past fee awards in other cases, we have both of those and we have the survey evidence, which I think must be accounted far more persuasive than a pile of affidavits from attorneys that one can go out and get to support whatever one wants. Okay, but there were two affidavits from San Diego area lawyers who handle longshore cases? One, I think, had handled some longshore cases. He had also worked with Mr. Dupree on non-longshore cases in which there was a fee-paying client. So he was familiar with his work. Okay, and am I right in remembering that the range, the hourly rate range that those two attorneys specified for San Diego, this 368 figure that the ALJ picked was within that range? I guess what I'm stuck is that seems to me the most on-point evidence. It was submitted by Mr. Dupree. If the ALJ just happens to pick a number toward the lower end, you're saying that that by itself we have to reverse? No, certainly not. I would agree that if that's the state of the evidence, then the ALJ does have discretion to say where in that range this attorney should fall. I think that description applies only to one of the two affidavits, and it was a couple of years out of date. So it would have supported a range that the rate awarded was near the bottom of four or five years before the ALJ's final fee award here, the one we're looking at. So I don't think that it would support a rate near the bottom of that range five years later. Now, yes, there's an inference involved in that. I think an ALJ certainly could take judicial notice, I don't know whether he's compelled to, of the increase in the legal services component of the consumer price index for all urban consumers. That's the best evidence we might be able to come up with of what the progression in rates has been from the date of that 2006 affidavit to 2011 when the ALJ made this fee award. I'm sorry. I had a question about the timing of it. The work was performed, I believe, in 2008. Is that right? Most of it, I think, was 2007, yes. 2007, 2008. So in your view, what is the correct rate to look at? Was it what lawyers charged in 2007 and 2008, or is it years later when the Benefits Review Board is making its decision? Well, I think actually it's when the ALJ makes his fee award if there has been a substantial delay between the time of the work and the time of that award. If it's only been as much as two years, this Court has said, forget about it, award historic rates. But if it has been more than that, then I think this Court's authority as well as the Supreme Court's indicated updated rates should be awarded. The Benefits Review Board has established a procedure in which if there's a long delay between the time of the fee award and the time it's finally paid, because, for example, the employer appeals the fee award and they don't have to pay it pending the outcome of the appeal, if there's been a substantial delay there, the Board says, you can go back and get a supplementary fee award to update it to now current rates. Can I have just one question about the 20% reduction? Please. So I just want to make sure I understand the state of play on that issue. Is your position that the only work that touched on the issue on which the underlying claimant lost were these two post-hearing depositions? Yes. I don't see how that could possibly be. I mean, there had to have been some work that was pre-hearing where Mr. Dupree figured out, boy, you know what, we shouldn't have conceded that. They must have done some kind of analytical work to figure out that, yeah, this actually would be beneficial to pursue, and there must have been some additional post-hearing briefing argument, something? There was additional post-hearing briefing in which Mr. Dupree, having pursued these two depositions after the hearing, acceded to the average weekly wage figure that had been agreed before. It was agreed up until the hearing, and at the hearing Mr. Dupree said, well, I thought we were only going forward with the surgery issue because that's what this litigation has been brought forward for, but if you're going to address extent of disability, I need to examine that further and depose some witnesses. Well, he asked and, in fact, insisted there had been an error previously by his associate, right? So he didn't just wake up that morning and say, boy, you know, I think it would be a good idea if we pursued this entirely separate issue. He must have done some work to figure out that that would benefit the client. No. In fact, the hearing record shows that Mr. Dupree came to that hearing thinking all they were going to try was his entitlement, Mr. Azouz's entitlement to the surgery, which he had been seeking for a year and a half and NASCA was denying was reasonable or was, in fact, NASCA was denying there was anything significant wrong with him at all and said that he could have gone back to work at the NASCA job. Right. Once more than the surgery was going to be addressed, that was the point at which Mr. Dupree said, I'm not satisfied. I'm not willing to stipulate to what my associate had been willing to stipulate to. But, no, there was nothing before, no work before by Mr. Dupree to evaluate that and say, oh, either we do or we don't need to present more evidence on that. Thank you. You've exceeded your time, but you may have a minute for rebuttal when the time comes. Thank you very much. May it please the Court, good morning. Roy Axelrod on behalf of National Steel and Shipbuilding Company. Your Honor, a threshold issue glossed over by Petitioner is the Court's standard of review. Respondent acknowledged that was briefly mentioned in Petitioner's opening brief and a little more in their reply brief. However, as the Court is well aware, its standard of review for review of attorney fee awards is one of abuse of discretion. And as the Court, the Supreme Court, the Ninth Circuit in Henson, the Supreme Court in Joyner emphasized, a hallmark of the abuse of discretion standard is substantial deference to the trial court, in this case the administrative law judge, who has a superior understanding of the litigation. Now, the present case was not especially extraordinary. It did not involve novel legal issues. It did not involve complex legal issues. In Christensen and Van Syk, as Petitioner notes, this Court concluded that in cases where the fee applicant fails to produce evidence of the relevant market and the rate charged in that market. Well, but here the argument is that we did produce evidence for the relevant market and the ALJ improperly rejected it. I mean, maybe you can respond to some of the points that you're pointing out. I will be happy to, Your Honor. In Christensen, the Ninth Circuit noted, and also where the fee applicant fails to carry his burden of proof. Petitioner argues that once we submit evidence, affidavits, that's it. That ignores the well-settled rule in longshore practice that the administrative law judge is required to accept or reject all or any part of any testimony or evidence. In this case, the administrative law judge concluded that that evidence submitted by Petitioner did not meet or carry his burden of proof. In fact, the administrative law judge noted and the BRB emphasized that the evidence submitted by Petitioner would support a range of hourly rates anywhere from $350 to $525 per hour. Therefore, the judge's determination that $368 was an appropriate hourly rate is well within that evidence, is supported by the record, and was within the discretion of the administrative law judge who had superior understanding of the litigation. What's your view of the 20% across-the-board reduction? Your Honor, I believe that's appropriate. In fact, below, Respondent maintained that it should have been a 30% reduction. Well, that doesn't make the 20% awarded reasonable, just because you argued for 30%. I understand, Your Honor. So he already had excluded the work that we all know that everyone concedes was directed only to the issue. The judge included 7.4 hours in his original decision, and those 7.4 hours represented two depositions on the average weekly wage issue. That's not the 20%, though. The 20% was directed to everything else. I understand, Your Honor. And I was going to add, in his decision on remand, he implicitly concluded that the 7.4 hours was not sufficient because he had originally concluded that the other hours were not severable. He could only sever the 7.4 hours. The BRB, in its original decision, vacated and remanded and concluded that just because the hours are not severable, that does not mean you cannot make an across-the-board adjustment. And since the petitioner failed on the issues of average weekly wage and the claimant's residual wage earning capacity, the judge concluded 20% was appropriate. And when you add the 7.4 hours, that adds up, in effect, to a 25% reduction. Okay. But I guess what I don't understand is what's the basis for the 20%? Was it some notion that, well, roughly one-fifth of the work done in connection with this proceeding was directed to the issues on which the claimant eventually lost? Or what's the rationale for picking 20%? I believe the rationale, Your Honor, is that the administrative law acknowledged and the Board acknowledged that the primary issue in the first litigation was whether the surgery proposed was unreasonable. However, the collateral issues were average weekly wage and residual wage earning capacity. And now Mr. Gillelan maintains that Mr. Duprey should have received a higher hourly rate. And he maintains that Mr. Duprey is very experienced, thorough, and excellent legal counsel. He further maintains and noted that in the original trial, even though they had agreed in their pretrial statement that regarding respondents' average weekly wage and residual wage earning capacity, at trial they repudiated that, and Mr. Duprey explained that, well, it was his associate that made that mistake. Frankly, that's a sophomoric mistake, and Mr. Duprey was counsel of record. Did the judge use that as reasoning for his determinations regarding hourly rate? No. But that would support an hourly rate. Well, I'm still trying to get an answer, though, to what's the basis for the 20%. Did it correspond to the ALJ's estimate of the amount of time that was devoted to the issues on which? I believe he did because he has a superior understanding of the litigation. But where is that? I just didn't see that explanation. Well, based on the average weekly wage, based on the residual wage earning capacity, the judge said looking at the litigation as a whole, the primary issue was unreasonable surgery. These were collateral issues. I believe 20% is an appropriate reduction based on his failure to succeed on these collateral issues. Now, as the Court is well aware, in tailoring fee petitions, there can be gamesmanship. The judge has a superior understanding of the litigation, and this Court in Hinkson, the Supreme Court in Joyner, has emphasized that the judge has a superior understanding of the litigation. And I believe based on his understanding of the litigation, he determined that was an appropriate reduction. I would like to also mention, if I may, Your Honor, that for the first time on appeal, Petitioner is now arguing about the post-decision reduction in the wind-up services post-decision. That was not argued, appealed by Petitioner in the first appeal to the Board. He only appealed the hourly rate determination. On remand, the judge made the hourly rate determination. On remand, the judge made the Hensley determination and did not really even address the post-decision wind-up services in his decision on remand. That was then appealed to the BRB, and the BRB affirmed the judge's determination as well within his discretion. Petitioner argues that the administrative law judge erred in his methodology. However, Petitioner has again ignored the evidence that he submitted which supports the ALJ's determination regarding the hourly rate, namely that $200 range in rates. I would also note that it was well within the judge's discretion to determine that the hourly rates for the other type of cases the judge concluded were not similar work because the other types of cases, ERISA and so on, involve heightened rules of evidence, heightened rules of civil procedure, and it's simply not similar work to longshore work. I have been involved in longshore practice since 1980. I have been involved in civil litigation. I was previously working with Littler Mendelson in San Diego, and in my experience, the litigation is simply not the same. There's a very relaxed, very relaxed rules of evidence and civil procedure in longshore practice. Therefore, the evidence of the hourly rates in those other cases is simply not similar work. Certainly the ERISA cases that your opponent mentioned sounded awfully similar. You would concede that. Well, but they have the different rules of evidence and the different rules of procedure. Why would that dictate a different hourly rate for the lawyer who's performing? Simply because it takes a different type of skill to be more familiar with all the different rules of civil procedure, the different rules of evidence. For example, in longshore practice, hearsay is admissible. In longshore practice, dowbear doesn't apply. In longshore practice, in my experience, a lot of judges say, well, we'll let the evidence in, and we'll give it the weight to which we believe it is entitled. They're just kind of second-class lawyers because they don't know all the fancy rules of evidence? No, Your Honor, I would not. Then how is that relevant to what the hourly rate should be? Because it's not similar work. And, in fact, in Christensen, the board, excuse me, the Ninth Circuit emphasized that it would leave to the board a determination of what the appropriate relevant community is and some of the other issues related to that. With all due respect, I would maintain that the ALJ has a superior understanding of the litigation. Well, so what work is similar? Why don't you tell us that? Well, the board has held that workers' compensation is not similar. The Ninth Circuit has held workers' compensation is similar. I would maintain longshore practice is a hybrid between California workers' comp because I'm not going to talk about other jurisdictions, and civil litigation. And, in fact, in this case, the judge looked at the rates in his decision on remand. The judge looked at the rates for general civil litigation, and he also looked at the rates for plaintiff civil litigation and general civil litigation. And he averaged those. Like the ERISA cases or the fair debt collection practices cases, right? He wasn't excluding those because they were so dissimilar in the way that you described. That is one way to read the decision, Your Honor. That's one way. Well, I mean, it's just the position you're trying to put, you know, Mr. Dupree in, I think, is an unfair one because, on the one hand, we've said, no, you have to go out and capture these market rates, right? For similar work. For similar work. And then you say, well, the only work that's somewhat similar is this workers' comp work. And so what? That's all? In all these cases, we're just supposed to have them submit declarations from workers' comp attorneys, and that's going to dictate the hourly rate? No, because the board has held that workers' comp, unlike the Ninth Circuit, the board has held, no, workers' compensation is not similar. But the key, Your Honor, if I may, is that the judge determined those rates, with the exception of two declarations, those affidavits and declarations were for other metropolitan areas. And the judge acknowledged that the Alton & Weil Survey of National Law Firm Economics was an imperfect measure. But he felt it was the most accurate up-to-date measure, and although he didn't note it, the record supports his determination regarding the hourly rate simply based on some of the affidavits submitted by Mr. Dupree. As the board noted in its decision, second decision, the ALJ's hourly rate determination was within the, quote, bounds of evidence preferred by petitioner, end quote, and as well as the evidence submitted by NASCO. Therefore, petitioner's appeal is essentially a request to the court that it review the evidence de novo and that the court engage in microscopic appellate scrutiny. The cases establish that in determining an hourly rate, it's an inherently difficult decision, as emphasized in Blum,  however, the intent is to achieve rough justice, not auditing perfection. And respondent maintains that petitioner is seeking auditing perfection and is requesting this court to re-weigh the evidence and engage in microscopic appellate scrutiny. Thank you, Your Honor. Thank you, Counsel. You may have one minute for rebuttal. May it please the Court. First, with respect to what the ALJ relied on at page 47 of the record in the decision, the ALJ's decision on remand, he says in the determinative sentence, given that both parties agree that Mr. Dupree falls within the upper quartile of attorneys with his level of experience, I will therefore use the upper quartile rates for partner shareholders from the 2009 survey, listing rates for these two specialties. Those are national figures. That's what the ALJ relied on. Now, I would certainly say that although the ALJ has discretion where a range of rates is shown to have been prevalent in the market, to pick a point on that continuum at which this attorney should fall, he's made that, he said, the upper quartile. But the BRB then says, but it turns out that that range corresponds at least somewhat to the range that these affidavits from the San Diego lawyers. Again, only one of those two affidavits suffered from that defect. It was a couple of years out of date, and it would support anything, of course, within that entire range that it specifies. But the other evidence, and particularly the survey evidence and the parties' agreement that Mr. Dupree should fall within the upper quartile, makes the board's reading their characterization of the ALJ's decision is simply not a possible reading of what he relied on. Thank you, counsel. Thank you. The case just argued is submitted, and we appreciate the helpful arguments from both parties.
judges: Graber, Rawlinson, Watford